Van Voorhis, J.
Judgment has gone against defendant-appellant upon the decision of the court after a trial without a jury, in an action for work, labor and services in printing. Defendant employed plaintiff to print a book entitled “ Beginners Bird Guide ”, which defendant was under contract to publish for a professor specializing in ornithology in Rutgers University, named Leon Augustus Hausman. Dr. Hausman had transferred to defendant his manuscript of this hook, accompanied by drawings in color for the 160 color plates of birds to be identified. This bird guide classified birds according to color, being divided into seven different color sections. All of the birds which were red or reddish were grouped into one section, others which were blue or bluish into another, and so forth. At the beginning of the volume were instructions under the caption: “ How to Use the Color Guide in this Book.”
The printing of the book was completed, and about 6,000 volumes were hound and delivered to defendant and by it distributed to booksellers. The remaining sheets for 9,000 copies were placed in a warehouse for future binding instruc *28 tions. Objections were raised by Dr. Hausman to colors of birds as printed in many of the final volumes, and thereupon defendant ordered all of the volumes to be returned which had been distributed to booksellers. Defendant refused to pay the purchase price to plaintiff, and demanded that plaintiff reimburse-it for the expense of advance advertising and shipping the 6,000 copies of the book to and from the booksellers, together with the profit which defendant estimated it would have derived from the sale of that number of copies. The answer also counterclaims for the value of the color drawings prepared by Dr. Hausman, possession of which was retained by plaintiff.
It is not disputed that final copies of the book exhibited important color deviations from the author’s drawings. Plaintiff has been held to have performed its contract, nevertheless, on the theory that before this work was undertaken, defendant and Dr. Hausman were informed that the colors were to be reproduced by a cheap process which would not be faithful to the originals, and that they examined and approved proofs or final press sheets before the pages came from the press or were bound in book form. The final press sheets submitted contained important variances from issued volumes of the book.
Defendant’s production manager, named Wendell Boos, testified that he consulted with plaintiff before contracting with the author to publish this bird guide, in order to ascertain the cost, which had to be kept down so that the book could be sold at a popular price. In response to this inquiry, plaintiff made an offer at a satisfactory price, which ripened into a contract and stated respecting color:
“ Plates: We make all plates for lithography. You supply us with colored sketches of the birds and good black and white proofs. We will make all color separations.
“ Presswork: Bun by lithography in four colors on one side of the sheet and one color reverse. The small form of 16 pages will run in black.”
No question has been raised concerning the sufficiency of the color sketches cr black and white proofs submitted to the plaintiff.
There was preliminary conversation concerning the nature of the color process to be employed, and plaintiff’s representative, P. Edward Ernest, testified that he told Boos and Dr. Hausman that if this book were to be done by the so-called manual separation method, a lithographic process, it would cost less than half as much as by photographic processes. Ernest was told that Boos knew nothing about ornithology, and *29 that Hausman was the man to be satisfied concerning the color reproductions. Hausman knew nothing about color processes in printing or lithography. Boos possessed some knowledge upon that subject, but was not engaged, like Ernest, in that line of work. Ernest testified that he told the other two men that with this process there were going to be many variations in color throughout the job, to which Dr. Hausman replied (according to Ernest) that it didn’t matter too much if the brown was a little darker or lighter, or if the background of the pictures was not exactly as they were drawn, and that he was willing to compromise by abandoning any requirement that different shades of the same color should be shown, and would be satisfied with flat colors “ since the purpose of the book was only so that the buyer could tell that a bird was yellow or red or blue or black or green. In other words, they were not to be perfect, in that the plumage of a bird has many variations of a certain color * * Ernest’s direct testimony continues:
“ Q. Instead of shading all different hues of red, different intensities of red, it was understood that just plain, flat red would be used throughout the job? A. That’s right. If a bird was red, it would be printed in red.
“ Q. As you stated, the purpose of the coloring was simply to indicate that the particular bird was a red bird instead of being a black bird; is that the idea? A. That’s right. That is the way I was given to understand it by Doctor Hausman.”
When the printer’s proofs were presented, there were not only variations in shades of color, but in numerous instances the colors themselves were wrong. Ernest testified that he then, for the first time, told defendant and Dr. Hausman that they could not expect to get a job that did not vary in color as well as in shades of color. They would have to be satisfied, in other words, with red blue jays and crows in shiny bluish green. This last testimony is against the weight of the evidence. According to Ernest, he then told defendant’s president, Melville Minton, that these proofs were about as good as they could get. Minton recalled no such conversation, but Boos testified that Ernest told him and Dr. Hausman: “ This is the first proof. Don’t be alarmed. We know the colors are off. We intend to show you another proof and will correct it.” Following receipt of another set of proofs, he and Boos went to Ernest’s office, and Dr. Hausman stated that the second proofs were so bad that he would not publish a book with his name on it in that condition. According to Boos, Ernest replied: “ We know that all the birds aren’t right. We know that there are varia *30 tions in the color. This is only a proof. When we get the job on the press, we will make the corrections so that the birds will be satisfactory.” Then bird by bird, Dr. Hausman pointed out what was wrong. The next set of proofs, also in evidence, shows that Dr. Hausman made explicit corrections of their colors in more than seventy birds. Following that, the so-called final press sheets were presented, which were better than the previous proof sheets. For example, they showed the blue jay to be predominantly blue, and the crow as black. Although there is no evidence that Dr. Hausman saw these final press sheets, a half dozen were submitted to Mr. Boos, who approved them for the defendant, according to Ernest. An examination of these sheets, in evidence, indicates that they were free from the worst of the color defects about which defendant complains, and which are so apparent in many of the completed volumes. The sheets submitted to defendant were not representative of the final result of the printing of the hook. There were material variances between different copies, and only the best press sheets were evidently selected for defendant’s eye. Plaintiff even suggested, to save the author’s and publisher’s reputations, that some five hundred of the best copies of the book should be sent to the cognoscenti in order to obtain favorable book reviews, and that the poorer copies be relegated to the public.
The trial court concluded that defendant and the author had agreed that the so-called lithographic hand separation process should be used to reproduce these colors, that consequently no warranty could have been made by plaintiff of accuracy in color reproduction provided that this process was followed with reasonable care, and that the burden rested upon defendant to produce evidence of negligence on the part of plaintiff in applying this process.
In this view of the case we think that the trial court erred. Plaintiff was in the business of color printing and lithographing; defendant and Dr. Hausman were not. It was understood between Ernest and Boos that Dr. Hausman, as the author of the book, was within reasonable limits the person to be satisfied with the colors before defendant could approve the job. Both he and defendant agreed to the use of this color process only in view of plaintiff’s representations of what it would and would not accomplish. They were entitled to rely upon the understanding with Ernest that the colors would be right, even if the process would not distinguish between different hues or intensities of the same color.
*31 Defendant’s president testified to the following conversation with plaintiff’s representative when the printing contract was made:
“ I told Mr. Ernest that because of Doctor Hausman’s reputation and because of the fact that we had some reputation of our own, and some integrity, the book had to be properly done or we couldn’t publish it; that if he could assure us that they could manufacture this book in the manner that was satisfactory, with us and we could send it out to our people and sell to our trade, we would go ahead with the manufacture of the book.
“ Mr. Ernest saw me and gave me his assurance that he could, and I said, ‘ All right, we will go ahead, ’ and we went ahead with the manufacture of the book.”
This epitomizes the testimony of Wendell Boos, defendant’s production manager, concerning his more detailed conversations with Ernest in the presence of Dr. Hausman, and was the basis on which we find it reasonable to conclude that the transaction was entered into. Of course it was understood that the hand separation technique would be used, but defendant was not required to go forward with evidence of negligence in the application of this color process; defendant and Dr. Hausman relied on plaintiff’s representations of what the process would do. It was not to be a deluxe edition; the colors were to be flat without shading, but birds that in nature are blue, grey or brown were not to be depicted as red, nor were white or grey to be represented as green or yellow. About fourteen instances of dominant color aberrations were established, the most serious being in the case of the blue jay, cape may warbler, brown creeper, female cow bird, least sandpiper, redtailed hawk, tufted titmouse, red eyed vireo, stormy petrel, rusty blackbird, red winged blackbird and crow. Portrayal of the crow seems to have been particularly inexcusable as an iridescent bluish green, in numerous volumes, since it was not necessary to superimpose any colors upon the dull black image produced by the black and white plate.
The fact that most of the 160 birds were correct is not the main point. The book was to satisfy a specialized demand from persons interested in learning facts about bird culture. Confronted by greenish yellow stormy petrels, bluish green crows and red blue jays, the student’s confidence in the correctness of the book as a whole would be seriously shaken. The reader would be uncertain of its accuracy respecting less familiar species. If a law professor were to begin his published legal *32 lectures with a statement that the rule in Shelley’s case was recently pronounced by the National Labor Eelations Board, though the rest of the volume were ever so accurate, it would be likely to be distrusted except by those who through previous knowledge had no need to study the tome. The maxim falsus in uno, falsus in omnibus would be likely to be applied in ornithology as well as in jurisprudence.
Not only were there express warranties that this color process would be reasonably adapted to the purpose intended, but there were implied warranties also. “ Just as in a contract to sell goods it is implied that the goods to be sold shall be merchantable, so in a contract of employment it is implied that the services shall be of the character which is customary in performing contracts of the kind in question. * * * Unless the contract contains some definition, the question is one of fact for the jury to determine what degree of skill the employer was justified in expecting — in other words, what was reasonable taking into account the nature of the employment and the usages connected with it. * * * One who holds himself out as exercising a profession, occupation, or business thereby represents that he is competent to perform services incident to that profession, occupation, or business; and is bound to exercise the skill which is reasonable in view of that representation.” (4 Williston on Contracts [Rev. ed.], § 1014, citing Snow v. Wathen, 127 App. Div. 948,112 N. Y. S. 41, and Weill v. Goodman, Shirt Waists, 102 Misc. 524.) To the same effect is the decision in Economy Fuse & Mfg. Co. v. Raymond Concrete Pile Co. (111 F. 2d 875).
We find as facts that although defendant and Dr. Hausman knew that the finished colors would be but reasonable approximations, nevertheless, the colors themselves were not to be interchanged, and that a substantial number of the printed volumes manifested color variations from the original color sheets and from the submitted final press sheets in such a degree as to render the book unmerchantable and unfitted for the purpose intended, and that the plaintiff has failed substantially to perform its contract.
The judgment appealed from should be reversed upon the law and facts with costs and disbursements to the appellant. New findings of fact should be made in accordance with this opinion, and the findings of the trial court reversed which are inconsistent therewith, and the complaint dismissed upon the merits, and judgment granted to defendant on its counterclaim for $625.25, representing cost of advance publicity and shipping expenses, but not profit on unsold volumes. The color sheets *33 transferred to defendant by the author as part of the manuscript, while the property of defendant, came lawfully into plaintiff’s possession, and it does not appear that a demand was made for their return prior to the commencement of this action. There is, therefore, no occasion to grant relief to defendant upon its second counterclaim, but without prejudice to the ultimate rights of the parties to said color sketches.